Strafford
No. 28-399

THE STATE OF NEW HAMPSHIRE

v.

SHEILA PORTIGUE

August 9, 1984

*Gregory H. Smith*, attorney general (*Brian T. Tucker*, assistant attorney general, on the brief, and *Gregory W. Swope*, assistant attorney general, orally), for the State.

*James E. Duggan*, appellate defendant, of Concord, by brief and orally, for the defendant.

BATCHELDER, J. The defendant was indicted and tried by jury in the Strafford County Superior Court (*Temple*, J.) for the second-de-

gree murder of her daughter, Amy. See RSA 630:1-b, I(b). After pre-trial motions to suppress were denied, and after jury trial, the defendant was found guilty. She was sentenced to from thirty years to life in the State prison. She appeals from the denial of her motions to suppress. We affirm.

The hearing on the motions to suppress adduced the following facts. On January 9, 1982, at about 1:00 a.m., Rochester Police Sergeant John Cook arrived at the Frisbie Memorial Hospital in Rochester. Upon arriving at the hospital, Sergeant Cook saw the badly bruised body of Amy Portigue and determined from a nurse and another police officer that the child was dead. He also learned that the child's father, Rodney Portigue, had brought the child to the hospital several minutes prior to Sergeant Cook's arrival. By this time, there were two other uniformed police officers at the hospital.

Sergeant Cook approached Rodney Portigue in the waiting room of the hospital emergency area and advised him of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Rodney at first told Sergeant Cook that Amy had been sick. In response, Sergeant Cook told Rodney that "there [were] bruises and cuts on the baby that were not . . . the result of sickness . . . ." According to Sergeant Cook, Rodney then told him that "for the past several months Sheila Portigue had struck Amy with her hands and feet."

Sergeant Cook then approached Sheila, who was also in the hospital waiting room with her two other children.

The defendant testified at the suppression hearing that she had driven herself and her two sons to the hospital in a family truck. The first person she saw at the hospital was a nurse. The defendant told the nurse that she was "Amy's mother," and the nurse directed her to wait in the waiting room.

Sergeant Cook testified that after he identified himself to the defendant, he immediately questioned her about her personal background. After eliciting certain personal data about her, he orally advised the defendant of her rights under *Miranda*. Sergeant Cook testified that, in response to her having been advised of her rights, the defendant said that she did not want to talk to him and that "she wished to have an attorney or a lawyer." Sergeant Cook then decided to leave the waiting room. Before leaving he "asked" the defendant to "stay" in the waiting room. The only person present with the defendant in the waiting room was a uniformed Rochester police officer.

Between 1:45 and 2:00 a.m., written *Miranda* forms were delivered to the hospital. The defendant was asked to fill out a form, on which she repeated her desire to have an attorney and her desire not

to speak to anyone. There was no evidence that the defendant wished the police to procure an attorney for her, and no effort was made to reach an attorney on her behalf.

Sergeant Cook then informed Captain Hall, Lieutenant Winship, Officer Moore, Officer McGee and Strafford County Attorney Dennis May, all of whom had arrived at the hospital sometime in the early hours of the morning, that he had read the defendant her *Miranda* rights and that she did not wish to speak to the police.

Eventually, a total of nine police officers were present at the hospital. As many as five of the officers were in uniform. One of the officers, Paul Moore, a juvenile officer, told the defendant that the police were "going to be taking custody of her two children and placing them in a crisis home." According to Officer Moore, the defendant said "fine" and that she "understood". The children were apparently taken into custody shortly before the defendant decided to talk to the police.

After 2:00 a.m., Rodney Portigue was interviewed in a small room in the hospital which was used as a doctor's office. Rodney signed a written waiver of his constitutional rights and gave a statement to the police. Present in the room during this interview were Captain Hall, Lieutenant Winship and Strafford County Attorney May. Rodney completed and signed his statement at approximately 3:00 a.m. In it, Rodney told the police that the defendant had beaten Amy by hitting her with a strap, kicking her, and pushing her against the walls so that Amy had fallen against a flower pot and "opened up" her chin.

Captain Hall then asked Rodney to try to get the defendant to speak to the police. At the hearing on the motions to suppress, Captain Hall was asked exactly what he said to Rodney. He replied:

> "A. I had mentioned to Rodney that I understood that his wife had mentioned she wanted an attorney earlier, and I asked if he thought that she would probably talk to us and he said he didn't know, and I asked him to go out and talk to her.
>
> Q. You asked him to go out and talk to Sheila to see if she would talk to you without an attorney?
>
> A. Correct."

Rodney then went into the waiting room unescorted by the police and spoke with the defendant. He returned a short while later and told the police that the defendant was willing to talk with them.

After 3:00 a.m., the defendant entered the doctor's office. Present in the small room were Lieutenant Winship, Captain Hall and County Attorney May. Captain Hall testified that:

"Sheila was brought into the doctor's office, at which time I advised her of her rights. Before I did this, I had mentioned to her . . . [that] I understand that you did not want to talk to us, that you had indicated you want to see an attorney, and is that still so, and she said no, that she would talk to us. I advised her of her rights as I did Rodney under *Miranda,* and after I read the form to her, I had her read it. I also had her sign it. I also had her put yes after paragraphs six and seven and initial it. She signed it."

Captain Hall questioned the defendant for nearly an hour about Amy. The defendant gave a complete and detailed statement describing how she had abused Amy. Her statement was typed on a police statement form. The defendant read the statement, directed that certain changes be made, and signed the statement. After completing the interrogation, Captain Hall asked Rodney whether he could search the Portigue home. Rodney consented to the search, while the defendant remained silent.

The Portigues then drove their car to their home in East Rochester. Following the Portigues home were Officer McGee, driving the Portigue's second vehicle, and Captain Hall, Lieutenant Winship, and Officer Moore driving an unmarked cruiser. At 5:24 a.m., they arrived at the Portigue home where they were met by Officer Caldwell, who had a consent-to-search form. Rodney signed the consent form, and the defendant witnessed his signature. At 5:25 a.m., five police officers entered the Portigue home.

As the police went through the house, the defendant was questioned about various items. Lieutenant Winship testified that:

"We went into the residence. The Captain asked, you know, if Sheila could point out the pot that Amy had fallen up against, and which Sheila went directly over by the kitchen table on the floor. She picked up a metal green planter and put it on the table and said, 'This is the pot Amy fell against and opened up her chin.' The Captain also asked whereabouts Sheila had kicked Amy and pushed her up against the wall, and which Sheila did point out the door casing area that goes into the living room and pointed out some marks which we had observed which appeared to be blood stains on the door casing."

At 6:00 am., the police left the Portigue residence, after having seized a blood-stained sheet from Amy's bed along with a metal plant pot and two leather straps. The defendant had pointed out the metal plant pot to the police, and Rodney had directed the police to

the leather straps and bed. The defendant had also identified a blood-stained door casing, which the police seized later that day pursuant to a search warrant. These items, together with the defendant's statements, were introduced at trial.

When the police left, they allowed the Portigues to remain at their home. The Portigues told the police that "they were going to stay right there." Lieutenant Winship testified that Captain Hall told the Portigues that "if they decided to go anywhere to relatives or to take off out of town or anything, if they could possibly call us to let us know so, you know, we could contact them with reference to the notification of what the cause of the death of the child was."

At about 3:00 o'clock that afternoon, the police called the Portigue residence and asked Rodney Portigue if he and his wife would come to the police station. The Portigues first went to a funeral home where they met the pastor of their church. After making funeral arrangements, the Portigues and the minister went to the Rochester police station.

After questioning Rodney Portigue at the Rochester police station, Rochester Police Juvenile Officer Kenneth McGee asked the defendant to come into his office. Present in the office was a Strafford County deputy sheriff. Officer McGee told the defendant he wished to speak with her in more detail about the death of her daughter, and the defendant agreed to talk. Again, the defendant was given *Miranda* warnings both orally and in written form. The defendant said she understood her rights and signed and initialed the waiver form. Officer McGee again asked the defendant if she wanted an attorney. The defendant said she did not and, at McGee's request, the defendant wrote on the waiver form: "I understand that I can have a lawyer here at this time, and I prefer not to." The defendant testified at the suppression hearing that what she wrote was the truth and that she knew she was not under arrest during the course of the interview.

As she had done at the hospital, the defendant signed a statement compiled from notes taken by police officers during the interview, and as before, she noted a correction she wanted made in the statement. Thereafter, the defendant was placed under arrest for second-degree murder.

The defendant in pre-trial motions moved to suppress all the inculpatory statements made by her at the hospital, at her home and later at the police station. She also moved to suppress the tangible evidence taken from her home. Following a hearing, at which nine witnesses testified, including the defendant, the Trial Judge (*Temple*, J.) denied the motions. The court found that the defendant's initial statements were not the result of a custodial interrogation

and that "[t]he State has shown beyond a reasonable doubt not only that the statements were given voluntarily, but also were given knowingly and intelligently." The court also found that the searches of the defendant's home were consensual.

On appeal, the defendant argues that the trial court erred in its rulings and in finding that the defendant's statements were not the result of a custodial interrogation. The defendant asserts that she was in custody and that the police failed to "scrupulously honor," *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), her right to remain silent. Also, the defendant claims that since she had asserted her right to counsel, the police were prohibited from any further interrogation in the absence of counsel unless she herself initiated contact with the police. *See Edwards v. Arizona*, 451 U.S. 477 (1981). Finally, the defendant contends that she did not initiate any further contact with the police and that, even if she had, the State must show that she made her statement only after having made a valid waiver of her right to counsel, and failed to do so. *Oregon v. Bradshaw*, 103 S. Ct. 2830 (1983).

The defendant makes her arguments with reference to the Federal Constitution alone. *See State v. Miskolczi*, 123 N.H. 626, 628, 465 A.2d 919, 920 (1983). We will not disturb the trial court's findings of fact unless they are contrary to the weight of the evidence or constitute an error of law. *See State v. Reynolds*, 124 N.H. 428, 434, 471 A.2d 1172, 1175 (1984).

In support of her contention that the police exerted significant control over her freedom of movement, to the extent that she was in police custody at the hospital, the defendant points to the following facts: She was asked to stay in the waiting room and a uniformed police officer remained there with her; the authorities took her children from her; she was never told that she was not under arrest and that she was free to leave; and, with the presence of nine police officers at the hospital, the atmosphere at the hospital was police-dominated.

Since the defendant claims that the police did not scrupulously honor her rights to silence and to counsel, we must determine whether, at the time she asserted her desire to remain silent and to see an attorney, she was entitled to these safeguards under *Miranda. See United States v. Timpani*, 665 F.2d 1 (1st Cir. 1981) (request for counsel but no custodial interrogation); *United States v. Ogden*, 572 F.2d 501 (5th Cir. 1978) (request for counsel but no custodial interrogation). The *Miranda* safeguards apply only to situations involving a custodial interrogation. *Miranda v. Arizona*, 384 U.S. at 467–68.

In *California v. Beheler*, 103 S. Ct. 3517 (1983), the United States Supreme Court undertook its most recent analysis of the factors that render an interview with police a custodial interrogation, and thus one during which the defendant is entitled to the safeguards first announced in *Miranda v. Arizona*, 384 U.S. 436 (1966). When those protections are not afforded or "scrupulously honored," *Michigan v. Mosley*, 423 U.S. at 104, a defendant is entitled to have his statement suppressed. *Id.* at 100. The Court in *California v. Beheler* held:

> "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*California v. Beheler, supra* at 3519–20 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

In *California v. Beheler*, as was the case in *Oregon v. Mathiason*, the police initiated contact with the defendant, who voluntarily came to the police station for an interview, following which the defendant left on his own accord. Quoting again from its decision in *Oregon v. Mathiason, supra* at 495, the Court stated:

> "'Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." . . . The police are required to give *Miranda* warnings only "where there has been such a restriction on a person's freedom as to render him 'in custody.'" . . . Our holding relied on the very practical recognition that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."'"

*California v. Beheler, supra* at 3519 (citations omitted).

The defendant would have us focus the analysis of whether her rights to counsel and to silence were honored scrupulously on the events that immediately surrounded her statement in the doctor's office. Since she had earlier asserted a desire to remain silent and to speak to an attorney, she would have us accept the premise that the police had to honor this desire if they sought to admit her statement into evidence. Properly, however, the focus of the inquiry is the

moments at which she expressed this desire; that is, when she did it orally and then later when she did it in writing on the police forms in the waiting room.

If she had no *Miranda* rights to invoke at these moments, because she was not then in custody, the police were faced with nothing they had to "honor" at their peril under a *Miranda* analysis. *See United States v. Timpani*, 665 F.2d 1 (1st Cir. 1981); *United States v. Ogden*, 572 F.2d 501 (5th Cir. 1978). Pointing to later events which may have contributed to a finding that she was in custody would not avail the defendant, for prior to her making her incriminating statement in the doctor's office, she was again given her *Miranda* rights, which she waived. *Cf. Edwards v. Arizona*, 451 U.S. 477 (1981) (where the defendant while in custody effectively asserted his right to counsel, which right could only be subsequently waived after he initiated some contact with the police). As a result, the fact that the defendant was later told that her children would remain at the hospital does not help her in describing her situation at the time of her assertions as being within the custody of the police.

 It is undisputed that the defendant was not formally arrested. Consequently, the issue of custody turns on whether the police, in the waiting room prior to their giving her the *Miranda* warnings, restrained the defendant's freedom of movement to a degree associated with a formal arrest. *California v. Beheler*, 103 S. Ct. at 3519–20. The presence of uniformed police officers clearly is not determinative, as the facts in *California v. Beheler* and *Oregon v. Mathiason* involved statements given at a police station. At the same time, the fact that the defendant was in a public place, without any physical obstacle preventing her departure, does not alone answer the question.

The police testimony uniformly indicates that if the defendant had attempted to leave the hospital, the police would ultimately have let her go because she was not under arrest, although they might have attempted to convince her to stay. The defendant testified that she decided to go to the hospital herself, and after awakening her two other children, she dressed them and drove to the hospital in a truck. She also testified that at the hospital she was first directed by a nurse to wait in the waiting room. She was not asked at the suppression hearing whether she felt she could have left the waiting room and the hospital, but importantly she did testify on cross-examination that the reason she stayed in the waiting room was that she was waiting for her husband and children. Although not directly pertinent to our analysis, she did testify that once she entered the doctor's office, she felt that she could not leave if she had desired to do so.

346

■ Viewing all the evidence, we hold that the superior court had a basis for finding that the police had not so restricted the defendant's freedom of movement at the hospital that she was in effect under arrest or in police custody at the time of her expressed desire to remain silent and to consult with an attorney. Consequently, based on this ruling, it follows that the police did not contravene any of the *Miranda* safeguards in their dealings with the defendant.

*Affirmed.*

All concurred.