Hillsborough
No. 87-506

THE STATE OF NEW HAMPSHIRE

v.

ROBERT DAVID DEDRICK

October 6, 1989

*Stephen E. Merrill,* attorney general (*Kathleen A. McGuire,* assistant attorney general, on the brief and orally), for the State.

*Joanne Green,* assistant appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J. The defendant, Robert David Dedrick, has been indicted for first degree murder in the stabbing death of Luis Ramirez. Following his June 1, 1987 arrest on this charge, Dedrick moved to suppress various statements he made to police officers and physical evidence seized from a Manchester apartment pursuant to a search warrant. The Superior Court (*Murphy,* J.) suppressed some of the statements and all of the physical evidence in question after a September 1987 hearing. Following disposition of its further motions for both reconsideration and additional factual findings, the State filed an interlocutory appeal with this Court, and Dedrick filed a cross-appeal. The questions before us are whether Dedrick was in custody when he made the relevant statements and, if so, whether those statements, which followed his request for counsel, were the product of interrogation. For the reasons that follow, we affirm and remand.

The parties agree on the following facts, all of which were presented at the September 1987 suppression hearing. Sometime after 3:00 a.m. on May 31, 1987, Sergeant James Stewart of the Manchester Police Department arrived at 560 Chestnut Street to investigate a possible homicide. There he found Luis Ramirez' body in the kitchen of the first floor apartment. The body bore multiple chest wounds. Two witnesses whom Stewart subsequently questioned suggested that Dedrick might have been the last person to see Ramirez alive, and the police attempted to locate him.

On June 1, 1987, at about 9:30 a.m., Dedrick phoned the Manchester police station. He told the dispatcher who answered that he understood the police were looking for him and wanted to know why. When the dispatcher asked Dedrick whether he would

come to the station to answer some questions, Dedrick said he had no transportation, but would come if someone picked him up. After Dedrick gave the dispatcher his location and a description of his clothes, Sergeant Stewart and Lieutenant William Bovaird met him, again asked whether he was willing to speak with them and, on his assent, transported him to the station. During the ride, conversation was limited to small talk about money Dedrick owed his landlord.

At the station, Sergeant Stewart and Lieutenant Bovaird accompanied Dedrick through the officers' entrance, up to the second floor, and into an interview room. There they informed him that he was not under arrest and that they would like to speak with him. Sergeant Stewart then obtained a brief background history and questioned Dedrick generally about his activities on the afternoon of May 30, 1987. During this time, Dedrick drank from a bottle of soda he had brought with him and left the room alone to use the men's room.

The interview room measures eight by eight feet and is windowless. It is lit by a single lamp and contains a round table and three chairs. Throughout the interview, Lieutenant Bovaird sat in front of the door, Dedrick sat opposite him, farthest from the door, and Sergeant Stewart sat between them. The door remained closed.

Dedrick told the officers that on the 30th he had been painting until 4:00 p.m. and had then gone to the apartment of a friend named "Luis." After a short period of time, he had left the apartment and played softball for awhile, before returning around 6:00 p.m. and leaving again around 7:00 p.m. When Dedrick finished relating his activities, the officers left the interview room and closed the door behind them. They then discussed his story and concluded that it contradicted information gathered from other witnesses. Sergeant Stewart testified at the suppression hearing that, while he and Lieutenant Bovaird were in the hallway, they also received information that Dedrick had owed Ramirez money for cocaine and that Ramirez had solicited two co-employees to "get the money back from [Dedrick] ... at any cost."

The officers then went back into the interview room and told Dedrick that they suspected he had been untruthful. Before asking him further questions, they read him his *Miranda* rights. Dedrick, who had never before been arrested, read and initialed each right on the State's standard waiver form and signed the accompanying waiver. The officers again told Dedrick he was not under arrest, but it was the last time they would do so. They then informed him

that Ramirez was dead. According to their testimony, he put his hands to his face, apparently surprised and shaken by this news. This was the first time during their encounter with him that the officers had mentioned to Dedrick that they wanted to question him about Ramirez. Stewart and Bovaird next confronted Dedrick with discrepancies between his earlier responses and those of other witnesses. The officers revealed that they knew Ramirez had dealt cocaine and had hired someone to collect $640 Dedrick owed him. They repeatedly suggested that Dedrick and Ramirez had argued over this debt and that Dedrick, who was "not a bad kid," had stabbed Ramirez in self-defense. They told him that his fingerprints and sneakers would likely match bloody fingerprints and footprints found in Ramirez' apartment. When Dedrick vehemently denied killing Ramirez, Stewart and Bovaird told him they knew he was lying because they knew "he was in [Ramirez' apartment]" and had worn sneakers on the night of the murder. They also told him they knew he owned a knife.

After forty minutes of heated questioning, Dedrick said he did not know what to do and felt he should speak with a lawyer. Lieutenant Bovaird immediately stood up and left the room. Sergeant Stewart also stood up, gathered his papers from the table, and said, "You want a lawyer, that's fine with us, but we'll never know Ramirez came at you with a knife." In response Dedrick suddenly exclaimed, "That's how it happened." He quickly added that Ramirez had indeed come at him with a knife, prompting him to punch Ramirez, take the knife away, and stab him. Dedrick then leaned across the table to show Stewart a cut on his arm.

Sergeant Stewart closed the door and sat back down. Lieutenant Bovaird soon returned as well and, when Stewart said Dedrick had confessed, they asked him to tell his story from the beginning. Dedrick then gave a detailed account of the incident and stated that he had thrown the knife in a trash can and left the clothes he had been wearing in his apartment. When the officers asked him to show them where he had disposed of the knife, Dedrick again requested an attorney. The officers stopped the questioning, helped Dedrick contact counsel, arrested him for murder, and placed him in a holding cell.

Alleging violations of his State and federal constitutional rights, Dedrick moved to suppress all the statements he made to officers Stewart and Bovaird and any evidence seized pursuant to the search warrant that was issued on the basis of those statements. The superior court found that, although Dedrick was not initially in custody, his "freedom of movement was restrained to a degree

associated with a formal arrest," and he was therefore in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), from the time the detectives reentered the room, gave him his rights, and confronted him with his presumed falsehoods:

"The Court finds and rules that the defendant was not in custody until the point at which the detectives confronted him with his allegedly inconsistent statements, at which time he was appropriately administered *Miranda* warnings. As the defendant was up until that time free to wander the hallways of the police station and go to the bathroom unaccompanied, the setting cannot be said to have been custodial. When confronted with the inconsistencies by the detectives, however, Dedrick certainly would be justified in concluding he was not then free to leave, even though the detectives assured him that he was not under arrest. It is simply ludicrous to suggest that the defendant could have risen from his seat and freely exited the interview room in the middle of an escalating period of interrogation and gone along on his merry way, especially when the detectives had developed a theory which directly implicated him, and it was their intention to question him further at that point about his involvement."

The court further found that the statement Sergeant Stewart made as he prepared to leave the interview room did not constitute interrogation, but that, given Dedrick's request for counsel, the officers' failure to obtain a further waiver of his rights before eliciting a detailed confession was contrary to *Miranda*'s dictates. The court therefore refused to suppress the words "That's how it happened" and the further statement that Ramirez had come at Dedrick with a knife which he had taken and used to stab Ramirez. However, the court suppressed all subsequent statements and all evidence seized pursuant to the search warrant based on these statements, since it found insufficient evidence to support the warrant in their absence.

On appeal, the State argues that Dedrick was not in custody for purposes of the Federal Constitution at any time preceding his formal arrest and that the superior court erred as a matter of law in finding otherwise. It contends that the court improperly decided the custody question from a subjective rather than an objective viewpoint and that facts presented at the suppression hearing were otherwise insufficient to support a finding of custody. Dedrick replies that the court correctly found custody, but erred in holding

that Sergeant Stewart's comment was not interrogation. He challenges the latter ruling on both State and federal constitutional grounds.

 Because the State bases its custody arguments solely on the Federal Constitution, and the superior court apparently held for Dedrick on that basis as well, we consider only federal law in addressing the custody issue. Whether a suspect was in custody for *Miranda* purposes is an essentially factual determination, and we will uphold the superior court in this regard unless its decision was contrary to the manifest weight of the evidence or the result of an error of law. *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified*, 830 F.2d 127 (1987); *State v. Sheila Portigue*, 125 N.H. 338, 343, 480 A.2d 896, 899 (1984). A person is in custody, and therefore entitled to *Miranda* protections during interrogation, where "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). Absent actual arrest, the trial court must determine the extent to which freedom of movement was curtailed not by discerning the perceptions of the particular suspect, but by considering "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Relevant factors include whether questioning took place in familiar surroundings, the number of law enforcement officers present, the degree of physical restraint placed on the suspect, and the duration and character of the interview. *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987). These factors establish custody where they indicate that authorities "'would not have heeded a request to depart or to allow the suspect to do so.'" *Beraun-Panez supra* (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969), *cert. denied*, 397 U.S. 990 (1970)).

 Contrary to the State's argument, the superior court properly based its custody determination on objective rather than subjective criteria. First, the court correctly stated early in its opinion that "the subjective beliefs of the arresting officers and arrestee [are] not determinative of when an arrest occurs." Moreover, the finding that "Dedrick certainly would be justified in concluding he was not free to leave" reflects consideration of what a reasonable man in Dedrick's position could properly conclude. That it was "ludicrous to suggest" that Dedrick could have left the interview room similarly evaluates the situation from an objective

standpoint. Finally, despite ample evidence on the question, the court made no findings at all as to Dedrick's actual subjective perception of his situation. We therefore hold that the court applied the appropriate objective standard.

It is likewise clear to us that the superior court did not conclude that Dedrick was in custody merely because he was a suspect or because he found himself in a coercive environment. *See Oregon v. Mathiason, supra* at 495 ("Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."). Rather, the court made specific findings as to the nature of the room in which Dedrick was questioned, the number and positioning of the officers, and the length and character of the interview. *See United States v. Masse supra* (listing relevant factors). Most significantly, the court specifically found that, on the officers' reentry after discussing his initial statement and discovering his debt to Ramirez, "the intensity of the interview escalated." Now Dedrick was not answering general questions about his background and activities, but was advised of his rights, accused of untruths and confronted with damning information. Further, despite his vehement denials, officers Stewart and Bovaird stated time and again that it was Dedrick who had killed Ramirez and that bloody fingerprints and footprints would give them the evidence to prove it. From these facts, the superior court discerned a sea change in the tenor and character of Dedrick's interview. Based on the testimony presented, such a change would have signaled a reasonable man in the same circumstances that the freedom officers had accorded him earlier was no longer available and that, as often as he made denials, they would renew their accusations until, in the end, he either confessed or asked, as Dedrick in fact did, to speak with an attorney.

The facts with which the superior court was presented and on which it based its custody determination are objectively ascertainable and directly relevant in determining custody. Most importantly, they are facts that a reasonable man would likely take to indicate that he was not free to leave. They thus amply support the superior court's custody determination, and that determination can in no way be described as clearly erroneous. We therefore uphold the superior court's conclusion that Dedrick was in custody at all times after officers Stewart and Bovaird returned to the room and read him his rights.

■ We similarly find no error in the court's determination that Sergeant Stewart's comment to Dedrick as he prepared to leave the room was not interrogation. Because Dedrick has raised his claim under both State and Federal Constitutions, we would normally address his State claim first. *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350 (1983). However, in this case, Dedrick has failed to enunciate either a State standard different from the federal one or any reason to adopt such a standard, and we therefore address his claim only under the Federal Constitution. *State v. Dellorfano*, 128 N.H. 628, 633, 517 A.2d 1163, 1166 (1986). When a suspect who is in custody for *Miranda* purposes requests an attorney, police must cease all questioning and its functional equivalents. *Rhode Island v. Innis*, 446 U.S. 291, 297–301 (1980). When officers utter words that they should know are reasonably likely to elicit a suspect's incriminating response, they engage in the functional equivalent of questioning. *Id.* at 300–02.

■ Here the superior court set forth the appropriate standard and found that, given Dedrick's vehement denials, Sergeant Stewart could not reasonably have anticipated that his comment would elicit a confession. While we think that the question is a close one and that Sergeant Stewart would have been well advised to withhold his comment, we defer to the superior court's determination since it applied the appropriate legal standard, and its factual finding was sufficient and not contrary to the manifest weight of the evidence. Our task on appeal is to determine whether the superior court applied the proper legal standards and whether there was sufficient evidence to support its decision. We will not overturn the superior court's decision on appeal simply because we might have ruled differently.

■ In short, because Dedrick was in custody for *Miranda* purposes when he requested an attorney, the officers could not renew questioning without obtaining a further waiver of his rights. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). They did not do so, and the superior court therefore properly excluded the detailed confession Dedrick made in response to further questioning. The court properly admitted the two statements preceding this confession, since they were not the product of interrogation.

*Affirmed and remanded.*

BATCHELDER, J., concurred; BROCK, C.J., concurred specially; THAYER, J., with whom SOUTER J., joined, dissented.

BROCK, C.J., concurring specially: I join in the opinion of my brothers Batchelder and Johnson. They apply the proper standard in reviewing the finding of custody, for we uphold a trial court's finding "unless we conclude that it is clearly erroneous or contrary to the manifest weight of the evidence." *State v. Gosselin*, 131 N.H. 243, 247, 552 A.2d 974, 976 (1988). In my view, the trial court's finding that the defendant "certainly would be justified" in concluding that he was not then free to leave," after the detectives returned to the interrogation room, was neither erroneous nor contrary to the manifest weight of the evidence, as detailed in the majority opinion.

Ambiguity apparent in decisions of the United States Supreme Court, however, leaves me less than certain that the standard we have found applicable in determining whether or not the defendant was in custody is the correct one. The trial court and the majority base the finding of custody upon language contained in *Berkemer v. McCarty*, 458 U.S. 420, 442 (1984) ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his position"), which seems to establish a somewhat different standard than that enunciated elsewhere in that opinion, *id.* at 439 ("safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest'" (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*))), and in previous cases addressing the same issue, *see Beheler supra* ("ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest" (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*))); *Mathiason, supra* at 494 ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'") (*per curiam*); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). Given these seemingly conflicting directives from the federal bench, I cannot conclude that the trial court here erred as a matter of law.

THAYER, J., dissenting: In ruling that the defendant was in custody from the point when the detectives read him his *Miranda* rights and accused him of being untruthful, the trial court stated that "[w]hen confronted with the inconsistencies [between his statements and the information obtained from other witnesses,]" the defendant could have concluded that he was not free to leave, "even

though the detectives assured him that he was not under arrest." The trial court found that at that time, the intensity of the interview "escalated," although "[n]o acts of intimidation or coercion took place," and that the detectives "had developed a theory which directly implicated [the defendant], and it was their intention to question him further at that point about his involvement."

The court held a hearing on the defendant's motion to suppress his statements and the physical evidence seized from 622 Prescott Street. The defendant testified that it was his belief that once the police indicated that they wanted to talk to him, he had no choice but to go to the station and do so. Thus, he testified, he felt his freedom was effectively restricted when Officer Forest asked him over the phone if he would talk to the detectives. He stated that he believed that if he did not go to the station and answer their questions, the police "probably would have found (him) and arrested (him) and taken (him) down there." He further stated that it was his belief that the police could arrest any citizen who was unwilling to talk to them. The defendant testified that he felt that if he had attempted to leave the station, the detectives would have stopped him. He acknowledged that the police had gone over his *Miranda* rights with him and that he understood those rights. He stated, however, that he believed that he could not exercise those rights. Defendant further stated that, although the police told him that he was not under arrest, he felt that he could not leave. He testified, however, that until the time that the police put him in the holding cell, they did not do anything to suggest to him that he was not free to leave. They had never told him that he was not free to leave, and he had not asked to leave or tried to leave. The officers had not taken out their guns, threatened him in any way, or screamed at him.

Despite the defendant's own testimony that the officers did nothing to suggest that he was not free to leave until they placed him in the holding cell, it appears that the trial court determined that somehow the station house setting, the detectives' informing the defendant of their suspicion (albeit unconfirmed) that finger-prints might exist to prove his involvement in Ramirez' death, the fact that the police had information that Dedrick owed Ramirez money for cocaine and Ramirez had hired two co-employees "to get the money back from [Dedrick] at any cost," and the fact that the interview was designed to produce incriminating responses, rather than any objective manifestation of police restraint upon the defendant's freedom, rendered the situation custodial. Because, as I interpret the relevant United States Supreme Court decisions, this

is not the appropriate federal constitutional standard to be applied, I would vacate the trial court's order and remand in order that the trial court may reconsider its finding of custody in accordance with the standard set forth below.

The appropriate inquiry in determining whether an individual is in custody for the purposes of *Miranda v. Arizona* is whether there is a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). Absent formal arrest, a finding of custody thus requires "at least some objective manifestation" of restraint on the defendant's freedom, *Fisher v. Scafati*, 439 F.2d 307, 310 (1st Cir.), *cert. denied*, 403 U.S. 939 (1971), and any unarticulated plan or intent to arrest the defendant that the officers may develop during interrogation "has no bearing on the question whether [the defendant] was 'in custody'" at that time. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

The United States Supreme Court's decisions, *Oregon v. Mathiason supra* and *California v. Beheler supra*, are particularly instructive here. In *Oregon v. Mathiason*, the defendant, a parolee, was suspected by the police of having been involved in a burglary. The defendant voluntarily came to the police station, where he was interviewed by a police officer in an office with the door closed. The officer informed the defendant that he was not under arrest and told the defendant that he wanted to speak with him regarding a burglary and that the truthfulness of the defendant's statements would possibly be considered by the district attorney or the judge. *Oregon v. Mathiason, supra* at 493. The officer further (falsely) advised the defendant that his fingerprints had been found at the scene. Shortly thereafter, the defendant confessed to the burglary. The officer then informed the defendant of his *Miranda* rights and took a taped confession. The defendant was released approximately thirty minutes after the interview had commenced. *Oregon v. Mathiason, supra* at 493–94.

The Supreme Court of Oregon reversed the defendant's conviction for burglary on the ground that his confession had been obtained in violation of his *Miranda* rights. The Oregon court stated:

> "We hold that the interrogation took place in a 'coercive environment.' The parties were in the offices of the State Police; they were alone behind closed doors; the officer informed the defendant he was a suspect in a theft and the authorities had evidence incriminating him in a crime; and the defendant was a parolee under supervision. We are of

the opinion that this evidence is not overcome by the evidence that the defendant came to the office in response to a request and was told he was not under arrest."

*State v. Mathiason,* 275 Or. 1, 5, 549 P.2d 673, 675 (1976), *rev'd, Oregon v. Mathiason supra.*

The United States Supreme Court summarily reversed, holding that on these facts "there [was] no indication that the questioning took place in a context where [the defendant's] freedom to depart was restricted in any way." *Oregon v. Mathiason, supra* at 495. According to the Supreme Court:

"Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*Oregon v. Mathiason supra* (emphasis in original). The Supreme Court expressly rejected the Oregon court's finding that the officer's false statement to the defendant about having discovered the defendant's fingerprints at the scene was "another circumstance contributing to the coercive environment" which triggered the applicability of *Miranda.* According to the Supreme Court, "[w]hatever relevance this fact may have to other issues in the case, it has nothing to do with whether [the defendant] was in custody for purposes of the *Miranda* rule." *Oregon v. Mathiason, supra* at 495–96.

Similarly, in *California v. Beheler,* the defendant was one whom the police suspected of murder; the defendant voluntarily came to the police station for questioning, where, as in the present case, he

was informed that he was not under arrest. After the interview, the defendant was told that his statement would be evaluated and he was then released. He was arrested several days later, and was tried and convicted partially on the basis of his statement.

The California Court of Appeal reversed the defendant's conviction on the ground that the police had failed to comply with *Miranda*. *California v. Beheler*, 463 U.S. at 1122-23. In determining that the defendant was in custody at the time he was questioned, the California court focused on the fact that the interview took place in the station house, the police had already identified the defendant as a suspect, and the interview was "designed to produce incriminating responses." *California v. Beheler, supra* at 1123. The California court attempted to distinguish *Mathiason* on several grounds including the temporal proximity of the interrogation to the alleged offense and the defendant's state of emotional distress. *California v. Beheler, supra* at 1124-25. The State court reasoned that the *Mathiason* decision did not preclude a consideration of the "totality of the circumstances" in determining whether a suspect is in custody. *California v. Beheler, supra* at 1125.

The United States Supreme Court again reversed, reiterating its holding in *Mathiason* with the now familiar statement that "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler, supra* at 1125 (quoting *Oregon v. Mathiason*, 429 U.S. at 495).

These cases clearly indicate that the questioning of one suspected of a crime rises to the level of custodial interrogation only when the police have restricted the individual's freedom of movement to the degree associated with a formal arrest. Thus, although I agree that custody must be determined by an objective reasonable standard, *see Berkemer v. McCarty*, 468 U.S. at 442, I remain convinced, unlike my brothers Johnson and Batchelder, that under the standard articulated by the Supreme Court, in order for the defendant's perception of custody to be reasonable, it must be based upon some objective manifestation of restraint upon the defendant's freedom; *i.e.*, some words or actions on the part of the police that would objectively signal to the defendant that he is not free to depart. *See Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) (although "any encounter with police may be both anxious and

unpleasant," such unpleasantness does not necessarily render the situation custodial under *Mathiason* and *Beheler*); *cf. United States v. Camacho*, 674 F. Supp. 118, 123 (S.D.N.Y. 1987) (restraints rendering the situation custodial included the officers' instructing the defendant to "sit down, remain seated, and make no sudden movements ... for *your safety* and our safety," as well as their monitoring the defendant's every movement including his use of the bathroom (emphasis in original)). Because it does not appear that the trial court based its ruling on such a finding, I would vacate and remand for further consideration by the trial court. Before leaving this issue and although not raised in this case, I must note my concern over the effect the majority's decision will have on fourth amendment issues.

I dissent as well from the majority's holding assuming the defendant is in custody that Sergeant Stewart's comment to the defendant following his request for counsel did not constitute interrogation pursuant to the federal constitutional standard set forth in *Rhode Island v. Innis*, 446 U.S. 291 (1980). The United States Supreme Court has defined interrogation for purposes of *Miranda* to include not only express questioning but also "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The appropriate focus in determining whether a particular statement constitutes interrogation is primarily on the reasonable perception of the suspect rather than on the intent of the police. *Id.* "[W]here a police practice is designed to elicit an incriminating response from the accused, [however,] it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 302 n.7.

Sergeant Stewart testified at the suppression hearing that in making the statement, which he characterized as a "parting shot," he had "wanted to give [the defendant] something to think about...." Lieutenant Bovaird testified that the police sometimes give such a "parting shot" to a suspect after he requests an attorney because "possibly [the suspect] would change his mind as far as having something to think about when he leaves the station." Thus, the admitted purpose of the officers' practice of making such a statement was to induce the defendant to "change his mind" and to confess prior to his consulting with an attorney. This uncontroverted evidence belies the trial court's finding that the statement was not intended to elicit an incriminating response. *Cf. United States v. Thierman*, 678 F.2d 1331, 1335 n.4 (9th Cir. 1982) ("police

practices designed to elicit an incriminating response will normally be deemed interrogation").

The ultimate question, however, is whether the statement was one which the officer should have known would be reasonably likely to elicit an incriminating response. The trial court found, and the majority apparently agrees, that the statement did not satisfy this test, because the defendant had previously denied the officers' self-defense theory, and Sergeant Stewart was "sincerely astonished" by the defendant's affirmative response.

I do not consider these facts to be determinative in characterizing the defendant's statement. That Sergeant Stewart was honestly surprised that his "parting shot" was successful in accomplishing its intended purpose of prompting a confession does not preclude a finding that such a result was reasonably foreseeable. The officer's statement must be viewed in the context of the entire circumstances and the reasonable perceptions of the defendant. During the preceding period of interrogation, the detectives had indicated to the defendant that they believed he was the person who had stabbed Ramirez and that their only question was whether he had done it in self-defense. Considering Sergeant Stewart's comment in this context, it was not, as in *Innis*, merely part of a conversation overheard by the defendant relative to a subject matter which the police had no reason to know was of any peculiar significance to him. *Cf. Rhode Island v. Innis*, 446 U.S. at 302 (no evidence that police were aware that defendant was peculiarly susceptible to an appeal relative to handicapped children). Rather, Sergeant Stewart's comment was made directly to the defendant, immediately following a forty-minute period of questioning which had focused primarily upon the self-defense theory. It was a direct challenge to the defendant to answer questions then, without an attorney, or lose his chance to explain that he had acted in self-defense. This practice amounted to more than the "subtle compulsion" which the Supreme Court found insufficient in *Innis*. *See id.* at 303.

This determination finds further support in the Supreme Court's explanation of the parameters of custodial interrogation in the *Innis* decision. Referring to the *Miranda* opinion itself for guidance in defining interrogation, the *Innis* Court observed that "[t]he Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.' ... It is clear that these techniques of persuasion, no less than express questioning, were

thought, in a custodial setting, to amount to interrogation." *Rhode Island v. Innis, supra* at 299 (quoting *Miranda v. Arizona*, 384 U.S. at 450). Here, Sergeant Stewart's "parting shot" to the defendant in essence posited that the defendant had merely stabbed Ramirez in self-defense, and that if he exercised his right to consult with an attorney, then the police would "never know" the mitigating circumstances of the incident. This was precisely the type of "psychological ploy" that, "no less than express questioning," the Supreme Court recognized as interrogation, which, in a custodial setting, implicates the procedural protections of *Miranda*.

Moreover, the Supreme Court has consistently recognized the value of a prophylactic "bright-line" prohibition of police-initiated questioning after the defendant has invoked his right to counsel. *See, e.g., Smith v. Illinois*, 469 U.S. 91, 98 (1984); *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983); *Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981) (following a request for counsel, the accused and not the police must reopen dialogue with the authorities). Absent such a rule, the police "through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Smith v. Illinois supra* (quoting *Oregon v. Bradshaw supra*).

For all of these reasons, I respectfully dissent. I would hold, therefore, that were the trial court upon remand to find the defendant in custody, the court must suppress the defendant's response to Sergeant Stewart's comment as the product of impermissible custodial interrogation.

SOUTER, J., joins in the dissent of THAYER, J.