Hillsborough
No. 86-342

# THE STATE OF NEW HAMPSHIRE

## v.

## TIMOTHY LEWIS

October 9, 1987

*Stephen E. Merrill*, attorney general (*William H. Lyons*, assistant attorney general, on the brief and orally), for the State.

*Joanne Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

SOUTER, J.   In this appeal from convictions in the Superior Court (*Dalianis*, J.) for robbery and second degree murder, the defendant claims that error infected five of the trial court's rulings: (1) the determination that the defendant voluntarily waived applicable *Miranda* rights before confessing; (2) the rejection of his claim that admitting his confession obtained through police interrogation infringed State guarantees of due process; (3) the rejection of his claim that the admission of pre-arrest statements made to a wired agent of the State violated both State and federal due process guarantees; (4) the refusal to authorize public funds for a "psychological autopsy" of the victim; and (5) the denial of a motion to order discovery of the victim's psychiatric records. We affirm.

The evidence warranted the jury in finding that the victim, Paul Madden, accosted the defendant, Timothy Lewis, on Hanover Street in Manchester in the early morning hours of March 31, 1984, and invited the defendant to his apartment for a drink. The defendant accepted the invitation and, either on the street or at the apartment, recognized the victim as a homosexual whom he had assaulted and disfigured a year and a half earlier, after the victim had made sexual advances.

On the night in question the two entered the apartment, and the victim served the drink he had promised. He then excused himself and a short while later emerged from the bedroom naked. When the defendant responded by striking him, the victim smiled and advanced again toward the defendant, whom he asked "to be nice" to him. The defendant kicked the victim in the groin and chest and kicked or otherwise struck him in the face and throat. In the course of the melee, the defendant assaulted the victim with a belt and possibly with a rock as well. When the victim asked the defendant to stop, the defendant left him on the bed, bleeding profusely, while the defendant rifled through the apartment. After he had taken twenty-six dollars and had attempted to dispose of any evidence that might link him to the crime, the defendant left and called on one Greenwood, whom he told about what he had done.

Later in the day, the victim's niece discovered his corpse in the bloody and disheveled apartment. An autopsy disclosed a fracture of the right temporal area of the victim's skull extending to its base; a fragment of bone displaced from the right side of the skull, which

had caused a subdural hematoma; fractures of the hyoid bone and thyroid cartilage; a broken rib; and a residue of eight ounces of blood that had flowed into the pericardial sack from a rupture of the pulmonary vein. The pathologist gave the cause of death as "multiple blunt injuries" of the head, the neck and the chest.

On April 2, 1984, the Manchester Police Department received an anonymous tip through its telephone "crime line," implicating the defendant both in the victim's death and in the earlier disfiguring assault. On April 11, a captain in the department met with the defendant and warned him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Although the defendant spoke with the officer, he denied any part in the crimes and mentioned that he had been with Greenwood on the night of the murder. The police thereafter interviewed Greenwood to see whether he would corroborate the defendant's story.

On May 9, after another caller on the crime line had accused the defendant of the murder, the police had a second interview with Greenwood and found that he had made the calls. They spoke with the defendant for a second time, also, after giving him the *Miranda* warnings again. The defendant was not under arrest, however, and in fact left after an hour because he wished to speak with counsel.

On the basis of information supplied by Greenwood, the police obtained a warrant to search the defendant's apartment for the trousers and sneakers he had worn on the night the victim was killed. An examination of the sneakers revealed human blood.

Greenwood's disclosures also suggested a further investigative step. Greenwood mentioned to the police that after each of their conversations with the defendant, the defendant would visit Greenwood to talk about his concerns. Accordingly, the police and members of the attorney general's office devised a plan under which the police would execute a search warrant to obtain hair samples from the defendant, with the expectation that he would then speak with Greenwood, who would be wired to record the resulting conversation. *See* RSA 570-A:2, II(d). Greenwood agreed to participate, the plan was executed on July 20, 1984, and the defendant made incriminating statements.

The police then arrested the defendant on a charge of murder. After ascertaining that he was free from any influence of alcohol and drugs, they gave him the *Miranda* warnings and requested a statement. The defendant signed a waiver of the applicable rights and made a confession that was later introduced into evidence at trial.

■■ The introduction of this confession over the defendant's objection is the first subject for consideration on appeal, the defendant claiming that the trial court erred when it found that he had waived his rights to remain silent and to require the presence of counsel during questioning. Given the defendant's objection, the State had the burden to demonstrate that, prior to speaking, the defendant knowingly and voluntarily waived his rights to silence and the presence of a lawyer, *Miranda*, 384 U.S. 436, 475, a matter to be judged not by concentrating on any narrow category of evidence but by examining its totality. *See North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979); *State v. Bushey*, 122 N.H. 995, 999, 453 A.2d 1265, 1267 (1982). We are mindful that a finding made by the trial court after examining the totality of evidence is entitled to stand unless it is contrary to the manifest weight of the evidence, *State v. Copeland*, 124 N.H. 90, 92, 467 A.2d 238, 240 (1983), viewed in the light most favorable to the State. *State v. Bushey supra.*

■ Although *Colorado v. Connelly*, 107 S. Ct. 515, 523 (1986), has recently held that the State need prove waiver only by a preponderance of the evidence, the State has not challenged the applicability of *State v. Gullick*, 118 N.H. 912, 915, 396 A.2d 554, 555 (1978), holding that the State must carry its burden by proof beyond a reasonable doubt. *State v. Goddard*, 122 N.H. 471, 473, 446 A.2d 456, 457 (1982). That will be our standard, then, in asking whether the evidence supported the trial court's finding that the defendant's ostensible waiver of rights was valid and effective.

■ As we understand the defendant's argument, he does not now take issue with the finding that he understood the *Miranda* rights at the time of his purported waiver. He disputes, rather, that he understood the concept of waiving rights and argues that his apparent waiver resulted from confusion produced by the conduct of the police. He invokes the rule that a valid waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception," *Fare v. Michael C.*, 442 U.S. 707, 726–27 (1979); *Moran v. Burbine*, 106 S. Ct. 1135, 1141 (1986).

The specific facts bearing on the defendant's claim may not be summarized so readily as the law, however, and because the issue is a close one, we will have to describe the circumstances of the defendant's preliminary colloquy with the police in some detail. Under a plan devised, again, in consultation with the attorney general's office, the Manchester Police Department followed an

unusual course in addressing *Miranda*. The police began in the normal fashion, by giving the defendant a written form containing statements of the several rights subject to the *Miranda* warning and waiver requirements. These statements were followed on the form by two questions to be answered by the suspect, (1) whether he understood the statements of the rights, and (2) whether he was willing to waive the applicable rights and answer questions.

The police captain in charge read each statement of rights aloud and discussed it with the defendant. After they had thus covered all of the rights, the captain then asked the defendant to "read question #1 and answer that accordingly, if you feel you can. If you have any questions about these, please ask me[.] I'll be glad to explain them to you as best I can." The defendant, however, immediately addressed the second question, and the following exchange occurred:

Defendant: "What's the waiver? What's the waiver mean?"

Police: "That just means that before answering these questions you are waiving—you do understand what these mean . . . ."

Defendant: "Am I giving up my rights?"

Police: "Oh no-no-no-not at all—not at all—not at all. It's just saying that you understand what this says over here."

The officer evidently then brought the defendant's attention back to the first question:

Defendant: "It says: Do you understand each of these rights? Yes."

Police: "Okay, that's the answer to that question. Okay, at this point I've been advised to, before we answer the next question, to give you some insights on why we're here and how we got here. . . ."

It was at this point that the procedure departed from the usual course. Instead of going directly to the second question, addressing the defendant's willingness to waive his rights and answer questions, the captain paused to summarize some of the incriminating evidence against the defendant. The captain explained how the police, with the attorney general's approval, had intercepted the defendant's recent conversation with Greenwood. Only after these disclosures did the officer direct the defendant to consider the second question on the form:

Police: "Okay, now, keeping [the State's evidence] in mind, I would like you to read the second question and decide whether you want to talk to me or you do not, and also sign that you are waiving your rights."

Defendant: "What do you mean waiving?"

Police: "Well, just the fact that you understand these, that you have no questions about these, that you understand you don't have to say anything. You're entitled to a lawyer, if you can't afford, one will be appointed for you. If you decide to answer some questions you can stop at any time."

Defendant: "Even if I sign it goes the same way?"

Police: "Yeh. Exactly. So, with that in mind, understanding these rights are you willing to talk to us, and answer any questions? You don't have to answer some questions if you wish, it's your prerogative. That's a yes, you're answering there I take it? Would you sign your name that you understand these rights and that you have answered these two questions. Okay. Tim, I'm signing as a witness that in fact you have signed this warning of rights . . . ."

The defendant proceeded to confess to performing the acts that killed the victim.

Based on this record, the defendant advances five arguments in trying to persuade us that the trial court erred when it found that the State had demonstrated that the apparent waiver was a knowing act of choice, untainted by deception or other overreaching by the police. We start with the defendant's strongest point.

He claims that the police captain who gave the *Miranda* warnings misled him into answering the second question affirmatively; *i.e.* that he did choose to waive the applicable rights. He points to a portion of the colloquy we have quoted above:

Defendant: "What's the waiver? What's the waiver mean?"

Police: "That just means that before answering these questions you are waiving—you do understand what these mean . . . ."

Defendant: "Am I giving up my rights?"

Police: "Oh no-no-no-not at all—not at all—not at all. It's just saying that you understand what this says over here."

If our review of the waiver were confined to this evidence we would unhesitatingly conclude that the defendant had been tricked into thinking that he would not be "giving up [his] rights" by making an uncounseled confession, when in fact that was exactly what he would be doing. But the transcript of the preliminary interview does not stop with this quotation. We think that the exchange following it indicates what the State argues, and what the trial court evidently found, that in the police captain's answers just quoted he was trying to concentrate the defendant's attention on the first of the written questions, which asked whether the defendant understood the rights as enumerated on the form.

It seems equally clear to us that, after reviewing the incriminating evidence already known to the police, the captain then directed the defendant to consider the second question, whether he agreed to waive his rights to silence and the presence of counsel during questioning. When the defendant asked again what the police meant by "waiving," the captain first alluded to the substance of the rights in question and then in comprehensible terms paraphrased the question by saying, "understanding these rights are you willing to talk to us and answer any questions . . . [?]" The defendant then gave a yes answer and signed the form.

■ There was nothing tricky, misleading or inaccurate about the police captain's response to the defendant's question about waiver at this point. Since the record indicates that the defendant was 28 years old, had a high school education and had been found to be free from the influence of alcohol and drugs after testing, we cannot seriously doubt that he understood that an affirmative answer to the captain's question meant that he was "willing to talk to [the police] and answer any questions" then and there, despite his right to decline to do so. The evidence thus points to a correct understanding of waiver, which supports the trial court's finding beyond a reasonable doubt. We may also add that we have examined a videotape of the events under discussion, and while the tape is poor, we could perceive nothing to raise any question about the conclusion we have reached.

The defendant's further challenges to the finding of voluntary waiver may be considered more briefly. He claims that when the police expressed their desire to question him on July 20, following his earlier decision to end questioning in order to consult with

counsel, they effectively suggested that it would be futile to insist on his rights. This argument, however, simply ignores the fact that the defendant's decision to end his interview with the police and to seek counsel occurred on May 9, nearly ten weeks before his confession. The lapse of time precludes any inference that the police were somehow ignoring the defendant's choice of May 9, or were otherwise wearing the defendant down by requesting interviews in the face of his manifest reluctance to talk.

█ We are likewise unable to find anything significant on the issue of waiver in the following exchange, which occurred on July 20 and referred back to the termination of the May 9 interview:

Police: "So, [we] did talk to you at that time. Uh, I think at that time we got you thinking that we realized what was going on and that you'd ask to subsequently to talk to someone before you continued.

We as gentlemen agreed and allowed you to go and consult with Dorothy. Subsequently, if I'm not mistaken, I called Dorothy later that day, you'd never made it there . . . ."

Defendant: "Dorothy was a court-appointed lawyer and I tried to get a hold of Ray Raimo but Ray Raimo requires 500 dollars for a retainer which I couldn't afford."

Police: "So anyway. So subsequently on May the 10th we met with a person who advised us . . . ."

The defendant would have us believe that his quoted answer expressed a desire for counsel on July 20. But we are unable to see it as anything other than what it purports to be, an explanation of his failure to consult with counsel on May 9.

█ Next, the defendant argues that the technical compliance with *Miranda* was effectively compromised when the police inserted the review of incriminating evidence between the discussion of the rights and the later discussion of waiver and opportunity to waive some of the rights. The most that we can say, however, is that the procedure seems as perilous as it was unorthodox. Certainly the summarization of evidence prior to the defendant's opportunity to waive or refuse to waive his rights could be construed as questioning in fact, though not in form, and as intended to provoke responses from the defendant. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The State took a serious risk that

the police comment on the evidence prior to waiver would provoke inculpatory responses that might not be followed by an effective waiver and independent confession thereafter. The State also ran the risk that the break between the discussion of rights and any later waiver might be so long as to invite the claim the defendant was no longer thinking of the rights when he gave his apparent waiver, which would therefore be invalid, because it was unknowing. But these risks did not materialize in this case, and there was no *per se* violation of *Miranda* merely in the hiatus between the inquiry into comprehension and the opportunity to choose in favor of waiver.

██ Finally, the defendant argues that the waiver was somehow tainted because the police videotaped the interview without mentioning that fact until the questioning was nearly over. The short answer is that the operation of the video camera had no bearing on the defendant's comprehension and volition, which are the objects of *Miranda*'s solicitude. "Events occurring outside the presence of the suspect and entirely unknown to him can have no bearing on the capability to comprehend and knowingly relinquish a constitutional right." *Moran v. Burbine*, 106 S. Ct. at 1141 (1986).

In sum, the defendant's challenges to the trial court's finding of waiver are inadequate to disturb the court's conclusion, and we turn to consider two issues of due process protection. The defendant raises the first under part I, article 15 of the State Constitution, in arguing that we should suppress the confession on the ground that, the defendant's waiver aside, it was fundamentally unfair to interrogate him without counsel after he had ended the preceding interview for the very purpose of consulting with counsel. He asserts that the State may not assure him of a right to counsel, only to ignore his attempt to invoke that very right. The defendant acknowledges that his claim goes beyond any protection recognized under the National Constitution, *cf. Edwards v. Arizona*, 451 U.S. 477 (1981), but argues that our State law should condemn the State's behavior, nonetheless.

██ We can only answer that the defendant is seeking to extend *Miranda* beyond its conceptual justification, on the basis of an argument divorced from factual reality. There is, to begin with, no predicate for viewing the defendant's decision to seek counsel on May 9 as the invocation of a right under *Miranda v. Arizona*, 384 U.S. 436 (1966), which applies only when the police seek to interrogate a defendant who is in custody or is deprived of his freedom to act in some significant way. *Id.* at 471. On May 9 the

defendant was not in custody; he was free to leave the police station and did so. *See California v. Beheler*, 463 U.S. 1121 (1983). Since he was not in custody or deprived of freedom, his decision to seek counsel was not the invocation of any *Miranda* right, and *Miranda* imposed no further obligation on the police. *See Edwards v. Arizona supra; State v. Portigue*, 125 N.H. 338, 345, 480 A.2d 896, 900-01 (1984).

The only remaining basis advanced for predicating a State right on the unnecessary *Miranda* warnings is the supposed unfairness of failing on July 20 to respect the defendant's election on May 9 to seek counsel. As we have already noted in a different context, however, the difficulty in the defendant's position is that a choice to seek counsel on May 9 does not indicate a desire for counsel on July 20. Common experience does not support such a factual inference, in the absence of which there is an air of unreality in suggesting that the police were fundamentally unfair to question him without counsel on July 20, despite his waiver on that date.

The defendant's second claim of fundamental unfairness invokes both article 15 and the fourteenth amendment, when he argues that the police violated due process in using Greenwood to provide the defendant with the opportunity to continue his past practice of discussing the murder and making inculpatory statements. Although we consider the issue initially under the State Constitution, *see State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983), a discussion of the State claim will serve as a consideration of the federal claim as well, for the defendant advances no basis in concept or policy for applying State and federal standards differently.

The argument that it was fundamentally unfair to use Greenwood as a wired informer is obscure to us. The defendant appears to acknowledge that there is no more basis in State than in federal law to find compelled self-incrimination in a non-custodial conversation between a defendant and an informer. *See Kirby v. Illinois*, 406 U.S. 682 (1972); *Escobedo v. Illinois*, 378 U.S. 478 (1964); *Miranda v. Arizona supra*. Nor does he claim that the use of Greenwood infringed his right to the assistance of counsel; he makes no suggestion that the State right to counsel arises prior to the commencement of adversary judicial proceedings, at which point the federal right arises under the sixth and fourteenth amendments. *Cf., e.g., Massiah v. United States*, 377 U.S. 201, 204-05 (1964).

■ On the heels of these implicit concessions, the only remaining basis for finding a constitutional violation would seem to be the use, *per se*, of an informer to elicit statements of the sort the defendant had a demonstrated inclination to make. This, however, is the essence of the informer's role, which we have recently upheld against a challenge under part I, article 19 of the Constitution of New Hampshire. *See State v. Kilgus*, 128 N.H. 577, 591, 519 A.2d 231, 240–41 (1986). We can only conclude by saying that fundamental unfairness does not occur for purposes of the due process clause simply because a defendant places himself at a disadvantage under circumstances in which there are no substantive constitutional violations. Since the defendant has cited no federal authority to the contrary, no further discussion is necessary to reject the fourteenth amendment claim.

The genesis of the defendant's remaining assignments of error was in his desire to present psychiatric evidence. First, he sought the court's authorization under RSA 604-A:6 to expend public funds to hire a psychiatrist, who would perform a "psychological autopsy" on the victim. As the defendant described it, the object of this desired process was to determine "the way in which [the victim] acted out the disturbance [resulting from his homosexuality, as it] relates to the defense of self-defense and the issue of provocation . . . ." The trial court denied the request for public funds, and the defendant faults the denial as an abuse of discretion in applying the standards that *State v. Campbell*, 127 N.H. 112, 498 A.2d 330 (1985) held to be applicable under the sixth and fourteenth amendments in reviewing requests to fund ancillary defense services.

■ In order to obtain reversal of a trial court's order under *Campbell*, the defendant must demonstrate that his request to the court included as complete a showing of necessity for the desired services as could be expected of him, and that the denial of funds substantially prejudiced him at trial. *Id.* at 117, 498 A.2d at 333. The defendant has satisfied neither condition here.

While psychiatric services will normally be necessary when a defendant's mental state is in issue, *id.* at 116, 498 A.2d at 332, the defense did not seek psychiatric help for this purpose. The psychiatrist was intended, rather, to reconstruct the victim's mental condition, and the defense did not come close to showing any necessity for this inquiry. Indeed, the request to the court did no more than suggest the defendant's optimistic hope that something helpful might turn up.

██ Nor has the defendant satisfied his burden to demonstrate that he was prejudiced. It is important to recognize that the so-called psychological autopsy could have done nothing more, at best, than corroborate the defendant's own descriptions of the victim's behavior prior to the killing. As the defendant described it, the victim engaged in a non-aggressive homosexual advance, and as it turned out the State never disputed the defendant's account. Even on the assumption, then, that the psychological reconstruction would have been admissible, it would have been addressed to a subject that was not, as a practical matter, in issue. Obviously, there is no basis to infer prejudice from refusing public money for such an exercise.

A related subject underlies the defendant's final point. The trial court honored the objections of the victim's family and refused to order discovery of the victim's psychiatric records, despite the defendant's claim that the records were essential to the defense of provocation. The defendant argues that the court should at the least have inspected the records *in camera*, and he seeks an order remanding the case for such inspection and giving him the opportunity to raise whatever further claim may be warranted by the result of the inspection.

We should note initially that in reviewing the trial court's decision, we do not mean to intimate any views on the cognizable interest of survivors in preserving the confidentiality of a decedent's medical or psychiatric records. *See* RSA 329:26. That specific subject has not been briefed or argued.

██ ██ To decide the present issue, it is enough to note two rules: (1) the statute provides that no physician shall be required to disclose a privileged communication "except as otherwise provided by law," RSA 329:26; and (2) discovery is generally subject to trial court discretion. *State v. Martin*, 125 N.H. 672, 675, 484 A.2d 1176, 1178 (1984). We can infer no abuse of discretion in refusing to order discovery of psychiatric files when, as here, there is no basis to infer that the records were "essential and reasonably necessary" to corroborate testimony on an issue in dispute. *State v. Farrow*, 116 N.H. 731, 733, 366 A.2d 1177, 1179 (1976). If the defendant had demonstrated that the State intended to contest his description of the victim's homosexual behavior, discovery might well have been required. But the defendant made no such showing, and there was consequently no abuse of discretion in refusing to order *in camera* inspection or other disclosure of the records.

*Affirmed.*

BATCHELDER, J., did not sit; the others concurred.