Rockingham
No. 89-283

THE STATE OF NEW HAMPSHIRE

v.

RAYMOND GRAVEL

December 31, 1991

*John P. Arnold,* attorney general (*Tina Schneider,* assistant attorney general, on the brief and orally), for the State.

*W. Kirk Abbott, Jr.,* assistant appellate defender, of Concord, by brief and orally, for the defendant.

BATCHELDER, J. The defendant, Raymond Gravel, appeals his jury conviction for possession of cocaine, claiming that the Trial

Court (*Dunn*, J.) committed error in refusing to grant his pre-trial motion seeking to have suppressed at trial certain statements he made after his arrest and all physical evidence obtained as a result of those statements. In addition, he claims that inadmissible hearsay was repeatedly placed before the jury, and that his requests for a mistrial on that basis were erroneously denied. For the reasons that follow, we reverse.

The facts, as they relate to this appeal, are as follows. During the mid-afternoon of July 18, 1988, the defendant, driving a late model Cadillac, sped past New Hampshire State Police Trooper Robert Quinn, who was parked on Route I-95 near Seabrook, talking with a hitchhiker. Trooper Quinn immediately pursued the speeding vehicle and came upon it stopped in the breakdown lane. Because he recognized the driver of the automobile, Ronald Fernald, as having been the passenger only moments earlier, Trooper Quinn concluded that the defendant, now in the passenger seat, had been driving the car at the time it went by. Having made this determination, Trooper Quinn, who smelled alcohol on the defendant's breath, administered three field sobriety tests, which the defendant was unable to perform satisfactorily. The defendant was placed under arrest, charged with driving while intoxicated, and transported to the Hampton police station.

Upon arrival at the station, the defendant was given the standard warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). He was then "processed" and given a test to determine his blood alcohol content. The results of the blood test showed a blood alcohol content of .16 percent. At this time, the police also learned that his driver's license had been revoked and that active bench warrants for his arrest for an unrelated offense were outstanding. Because the Hampton police station could not hold him overnight, the defendant eventually was transported to the Rockingham County Jail.

Trooper Quinn testified that the following conversation took place en route to the jail.

Defendant: "Is there a doctor at the jail?"

Trooper: "Well, do you want to go to the hospital?"

Defendant: "No. But I am going to need to see somebody."

Trooper: "Why?"

Defendant: "Well, I am going to be coming down in a few hours, and I am going to need something."

Trooper: "Well, what are you coming down from?"

Defendant: "Coke. What do you think?"

Trooper Quinn then asked the defendant how much cocaine he had ingested. The defendant responded by saying that he had "free-based" an "eightball" (eighth of an ounce) of cocaine earlier in the day. The conversation continued:

> Trooper: "Oh . . . . Well, do you have any more drugs on you?"
>
> Defendant: "No. I am not stupid enough to get caught carrying it."
>
> Trooper: "Well, where do you do your drugs?"
>
> Defendant: "I do everything in my bedroom."

The defendant went on to say that he had used the drugs that day in his bedroom.

The police used information garnered from this conversation to obtain a warrant to search the defendant's bedroom. The fruits of the subsequent search included, among other things, a mirror, a razor blade, and trace amounts of what was later determined to be cocaine. The defendant was subsequently charged with possession of cocaine.

Prior to trial, the defendant filed a motion to suppress the statements he made during his transport to the jail, as well as all physical evidence gathered as a result of those statements. Citing both the State and Federal Constitutions, the defendant asserted that the information about his drug use was obtained in violation of *Miranda*, as he did not knowingly, intelligently, and voluntarily waive his rights to remain silent and to counsel, and that, therefore, the information could not be used to establish the requisite probable cause for issuance of a search warrant. He claimed that, absent the allegedly tainted information, there was insufficient independent information to establish probable cause, making the search illegal and the fruits of that search inadmissible at trial. The State, on the other hand, argued that the defendant had initiated the conversation, that Trooper Quinn simply followed up on information volunteered by the defendant, and that *Miranda* did not apply.

The trial court agreed with the State's position and denied the defendant's motion to suppress, noting that the "defendant cannot claim a violation of *Miranda* when he is not being interrogated, he himself initiates the conversation with the police and voluntarily makes inculpatory statements." The trial court found "that [Trooper] Quinn was not obligated to readminister *Miranda* rights to the defendant during transport to the jail since the relevant testi-

mony show[ed] that the defendant was fully aware of his constitutional rights at all times." Finally, the trial court determined "beyond a reasonable doubt that the defendant waived his constitutional rights."

On appeal the defendant reiterates his references to both the State and Federal Constitutions in arguing that the statements were both inadmissible and an invalid basis for finding probable cause to search. Consistent with our holding in *State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983), we first consider the defendant's claims under part I, article 15 of the New Hampshire Constitution, "us[ing] federal case law only as an aid to our analysis. *See Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983)." *State v. Plante*, 134 N.H. 585, 588, 594 A.2d 165, 166 (1991).

■ We begin our analysis by recognizing that this court will not reverse a decision of the trial court unless, when viewed in the light most favorable to the State, the decision is contrary to the manifest weight of the evidence. *State v. Torres*, 130 N.H. 340, 344, 540 A.2d 1217, 1220 (1988); *State v. Lewis*, 129 N.H. 787, 791, 533 A.2d 358, 361 (1987) (citations omitted). Having thoroughly reviewed the record before us and the relevant case law, however, we conclude that the trial court's decision in this case cannot stand. The defendant was indeed subjected to custodial interrogation at the time he uttered the inculpatory statements; therefore, the mandates of the *Miranda* decision were applicable. We further conclude that the *Miranda* requirements were not satisfied here, as the defendant did not expressly waive his constitutional rights, and the State failed to present any credible evidence of waiver. The State failed to prove beyond a reasonable doubt, as it was required to do under our State law, that the defendant knowingly, intelligently and voluntarily waived his constitutional rights. We also hold that the search warrant was tainted by the *Miranda* violation and, as no independent evidence existed to establish probable cause, the search of the defendant's bedroom was illegal and the evidence thereby seized inadmissible at trial.

## I. *Miranda Analysis*

■ The threshold issue is whether, at the time the defendant made the inculpatory statements, he was entitled to *Miranda* protections. It is well settled that the *"Miranda* safeguards apply only to situations involving a custodial interrogation." *State v. Sheila Portigue*, 125 N.H. 338, 343, 480 A.2d 896, 900 (1984); *State v. Lewis*, 129

N.H. at 796, 533 A.2d at 364. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444. Although there is no dispute that the defendant was in custody at the time he made the inculpatory statements, the State contends that he was not being questioned, as he in fact initiated the conversation and volunteered the incriminating comments.

■■ "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation." *Id.* at 301. In this case, although the defendant initiated the conversation "in the ordinary dictionary sense of that word," *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983), Trooper Quinn extended it with express questions of his own, *see United States v. Montgomery*, 714 F.2d 201, 202 (1st Cir. 1983). The defendant clearly opened the dialogue by asking if there would be a doctor at the jail, but it was Trooper Quinn who shifted the direction and altered the character of the conversation. While the officer's initial queries into the type of drug used, the method employed, and the amount ingested were follow-up questions germane to determining whether medical care would be required, his subsequent questions pertaining to the location where the drug was used sought only to elicit incriminating evidence and, thus, constituted interrogation. *See State v. Dellorfano*, 128 N.H. 628, 634, 517 A.2d 1163, 1167 (1986).

■ In fact, Trooper Quinn admitted as much when he testified that although he "started asking the questions for medical reasons," once the defendant "started talking about his drug use, . . . a red light went off and said: there may be more drugs in his bedroom." He further conceded that the fact that the defendant used drugs in place A versus place B had nothing to do with his current medical condition. The defendant's statements that he "did drugs" exclusively in his bedroom and that he had freebased cocaine in his bedroom that day were offered in response to Trooper Quinn's specific questions. We hold that once the focus of the colloquy shifted from the potential need for medical care to an inquiry concerning the location of the defendant's drug use, it constituted custodial interrogation within the meaning of *Miranda*.

■■■ Having found that the defendant was subjected to custodial interrogation at the time he made the inculpatory remarks, we now consider whether there was a waiver of the *Miranda* requirements. Although it is undisputed that no express waiver of these rights was ever executed by the defendant, "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979); *see State v. Plante*, 133 N.H. 384, 386, 577 A.2d 95, 97 (1990); *State v. Sullivan*, 130 N.H. 64, 68, 534 A.2d 384, 386 (1987). The presumption, however, is that a defendant does not waive any constitutional rights, and a heavy burden rests with the State to prove otherwise. *State v. Torres*, 130 N.H. at 343, 540 A.2d at 1219; *see North Carolina v. Butler, supra* at 373. Accordingly, it was the State's responsibility to prove beyond a reasonable doubt that the defendant voluntarily, knowingly and intelligently waived his constitutional rights. *State v. Torres*, 130 N.H. at 342–43, 540 A.2d at 1219; *State v. Bushey*, 122 N.H. 995, 999, 453 A.2d 1265, 1267 (1982). This determination can be made only after considering the totality of the circumstances surrounding the particular case, "'including the background, experience, and conduct of the accused.'" *North Carolina v. Butler, supra* at 374–75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see State v. Bushey supra*.

■■■ The State was required to establish that the alleged waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see State v. Bushey supra* (waiver requires "a rational choice based upon some appreciation of the consequences of the decision"). It is "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension [that] a court [may] properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine supra* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The defendant was informed of his rights, as required by *Miranda*, at the Hampton police station. Although he appeared to understand his rights and in fact did acknowledge them, he was never asked if he understood them; nor does Trooper Quinn remember asking him if he wished to waive them.

In attempting to establish an implicit waiver, however, the State makes much of the fact that the defendant initiated the conversation. That fact alone, however, "does not end the inquiry. . . . The 'totality

of the circumstances' must still be considered in determining 'whether the purported waiver was knowing and intelligent.' The burden, as always, is on the government and is a heavy one." *Montgomery*, 714 F.2d at 203 (quoting *Miranda*, 384 U.S. at 475). In this case, the defendant opened the dialogue, focusing on the availability of medical care. It cannot fairly be said that this limited inquiry represented "a desire on the part of [the] accused to open up a more generalized discussion relating directly or indirectly to [further criminal] investigation." *Oregon v. Bradshaw*, 462 U.S. at 1045. The defendant's question was merely an "inquiry arising out of the incidents of the custodial relationship," *id.* at 1046, and clearly did not evince "a willingness and a desire for a generalized discussion about the investigation," *id.* at 1045–46. In this instance, Trooper Quinn used the defendant's "simple, not-guilt-suggestive question as a license to launch a fishing expedition." *See Montgomery*, 714 F.2d at 205. There is no indication that the defendant was either thinking of his constitutional rights or intending to waive them when he opened the dialogue by inquiring as to the availability of medical treatment. *See State v. Lewis*, 129 N.H. at 796, 533 A.2d at 363; *State v. Torres*, 130 N.H. at 344, 540 A.2d at 1220.

Given the very limited focus of the defendant's initial inquiry, we accordingly hold, as a matter of law, that a reasonable doubt exists as to whether he knowingly and intelligently waived his rights. His statements should, therefore, have been suppressed at trial. In light of our conclusion that the defendant was indeed subjected to custodial interrogation at the time he uttered the inculpatory remarks, and our further conclusion that the State failed to prove a knowing and intelligent waiver, we now go on to consider the ramifications of the *Miranda* violation.

## II. *Use of Evidence Obtained in Violation of Miranda*

The defendant argues that because the incriminating remarks must be suppressed due to the *Miranda* violation, these same statements cannot be used to establish the requisite probable cause for issuance of a search warrant. He further maintains, therefore, that all the objects of the search of his bedroom are "fruits of the poisonous tree" and inadmissible at trial. The State, however, asserts that a violation of the prophylactic *Miranda* rule, as opposed to a violation of the fifth amendment, does not by itself necessitate excision of the defendant's statements from the affidavit. Because the defendant's fifth amendment rights were not violated, the State ar-

gues, the exclusionary rule is not applicable and his conversation with Trooper Quinn can properly be relied upon to establish probable cause.

■■■ We have never had occasion to decide "whether the 'fruit of the poisonous tree' doctrine would forbid reliance on illegally obtained evidence for the purpose of establishing probable cause." *State v. Maya*, 126 N.H. 590, 599, 493 A.2d 1139, 1146 (1985). Neither has the Supreme Court of the United States decided the precise issue here, while in *Michigan v. Tucker*, 417 U.S. 433, 447 (1974), it "expressly left open the question of the admissibility of physical evidence obtained as a result of an interrogation conducted contrary to the rules set forth in *Miranda*." *Patterson v. United States*, 485 U.S. 922, 922 (1988) (White and Brennan, JJ., dissenting from denial of *certiorari*). Although some courts faced with this question have concluded that physical evidence so obtained should not be excluded, *see, e.g., United States ex rel. Hudson v. Cannon*, 529 F.2d 890, 894–95 (7th Cir. 1976); *Wilson v. Zant*, 249 Ga. 373, 377–79, 290 S.E.2d 442, 447–48, *cert. denied*, 459 U.S. 1092 (1982), others have reached the opposite conclusion, *see, e.g., State v. Preston*, 411 A.2d 402, 407–08 (Me. 1980); *Commonwealth v. White*, 374 Mass. 132, 138–39, 371 N.E.2d 777, 781 (1977), *aff'd by an equally divided court*, 439 U.S. 280 (1978). Our analysis of the relevant United States Supreme Court decisions against the backdrop of our State constitutional guarantee against compelled self-incrimination leads us to hold under part I, article 15 that information obtained in violation of the *Miranda* safeguards is an impermissible predicate for a search warrant. Absent the tainted information in the search warrant application here, the warrant lacked a showing of probable cause, and the resulting search violated part I, article 19 of our State Constitution. The evidentiary fruits thus derived from the *Miranda* violation were therefore inadmissible at trial. We start with an examination of the exclusionary principle at issue.

■■■ The "fruit of the poisonous tree," or "derivative evidence," doctrine, first articulated by the United States Supreme Court in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920), and later in *Wong Sun v. United States*, 371 U.S. 471 (1963), requires the exclusion from trial of evidence derivatively obtained through a violation of the fourth amendment: "'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.'" *Wong Sun, supra* at 485 (quoting *Sil-*

*verthorne Lumber Co., supra* at 392). Proscribing the derivative use of illegally obtained evidence serves the objective of deterring future unlawful police conduct, *see Michigan v. Tucker, supra* at 446–47 (citing *United States v. Calandra,* 414 U.S. 338, 347 (1974)), by denying the police the benefit of all of the products of that conduct.

Although the *Wong Sun* "fruits" doctrine was developed in the search and seizure context, with the primary illegality a fourth amendment violation, the United States Supreme Court has suggested that the underlying deterrence rationale would mandate exclusion of evidentiary fruits where the "poisonous tree" was a violation of the fifth amendment's protection against self-incrimination. *See Michigan v. Tucker, supra* at 446–47. The Court has also indicated, however, that where a *Miranda* violation is the primary illegality, the *Wong Sun* analysis will not necessarily control. Distinguishing between violations of the prophylactic, procedural *Miranda* rules, designed to protect an individual's fifth amendment rights, and the "actual infringement of . . . constitutional rights" by obtaining a coerced confession, *Oregon v. Elstad,* 470 U.S. 298, 308 (1985), the Court has refused to apply automatically the *Wong Sun* exclusionary rule to evidence derived from *Miranda* violations. *See id.; Michigan v. Tucker supra.* Instead, where only a *Miranda* violation was at issue, the Court has focused on whether the value of deterrence would be served in the particular case and on the nature of the "fruits" at issue. *See Elstad; Tucker.* While, as we discuss below, we do not subscribe to the Court's "*Miranda* versus constitutional violation" distinction, we find its leading decisions instructive in our own analysis of the deterrence rationale.

*Michigan v. Tucker,* where the Court first announced the dichotomy between an actual constitutional violation and a departure from the *Miranda* rules, involved a custodial interrogation occurring prior to the *Miranda* decision. No actual compulsion took place, and the police warned the defendant of all of his rights except for the right to appointed counsel. Emphasizing that its holding was based on a "narrow[ ] ground," *Tucker,* 417 U.S. at 447, the Court held that the deterrence rationale of the "fruits" doctrine would not be served by suppressing the derivative evidence where the police had conducted the interrogation in good-faith compliance with then-existing law. *Id.* at 446–47 (citing *Escobedo v. Illinois,* 378 U.S. 478 (1964)). Additionally, the fruit of the *Miranda* violation was the identity and testimony of a third-party witness, not physical evidence.

The significance of the nature of the derivative evidence and its relation to the deterrence rationale was underscored by the Court in

*Oregon v. Elstad supra.* The *Elstad* Court applied the *Tucker* reasoning where the fruit of the unwarned confession was the defendant's own subsequent confession, given after proper *Miranda* advisement. Although the police had initially violated his rights by failing to give him the warnings, "[o]nce warned, the suspect [was] free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Elstad, supra* at 308. Noting that live testimony ""''is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized,"''" 470 U.S. at 308–09 (citations omitted), the Court held "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318.

The nature of the fruit of the *Miranda* violation was in this manner connected with the deterrence rationale; deterrence of police misconduct by ascribing taint to and excluding the later confession would have been difficult to justify when the derivative second confession was a product of the defendant's own free will. Physical evidence, however, is different, and the importance of this difference did not escape the notice of the dissent in *Elstad*:

> "Notwithstanding the sweep of the Court's language, [the] opinion surely ought not to be read as also foreclosing application of the traditional derivative-evidence presumption to physical evidence obtained as a proximate result of a *Miranda* violation. The Court relies heavily on individual 'volition' as an insulating factor in successive-confession cases. . . . [This] factor is altogether missing in the context of inanimate evidence."

*Oregon v. Elstad*, 470 U.S. at 347 n.29 (Brennan, J., dissenting).

Here we are faced with the inanimate evidentiary products of a *Miranda* violation, items seized under authority of a search warrant founded on statements obtained without a waiver. No "'act of free will,'" *Elstad*, 470 U.S. at 311 (quoting *Wong Sun*, 371 U.S. at 486), on the defendant's part intervened. Probable cause to search the defendant's home was arrived at by "'exploitation of [the primary] illegality . . . instead [of] by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun*, 371 U.S. at 488 (citation omitted). In such circumstances we believe that deterrence of the initial unlawful police conduct in failing to observe the *Miranda* safeguards is not achieved by suppressing only the statements so obtained. We agree with the Maine Supreme Judicial Court's reason-

ing in *State v. Preston*, 411 A.2d 402, where the defendant, responding to unwarned interrogation, told the police where certain stolen items could be found. Holding that the physical evidence must also be excluded as derived from the *Miranda* violation, the court explained, "The deterrent effect on police misconduct of excluding admissions obtained [in violation of *Miranda*] would be substantially reduced if real evidence delivered to the police as part of the suspect's direct response to the unwarned custodial interrogation were permitted in evidence." *Id.*, 411 A.2d at 408.

Prosecutors and police officers understand that the consequence of failing to abide by *Miranda* is the suppression of the defendant's statements. To allow the police the freedom to disregard the requirements of *Miranda* and thereby risk losing only the direct product of such action, but not the evidence derived from it, would not only not deter future *Miranda* violations but might well tend to encourage them. An officer more concerned with the physical fruits of an unlawfully obtained confession than with the confession itself might reasonably decide that the benefits of securing admissible derivative evidence outweighed the loss of the statements. *Miranda* would thus have lost a substantial amount of its value in protecting against compelled self-incrimination. *See* H. Shapiro, *Miranda Without Warning: Derivative Evidence as Forbidden Fruit*, 41 BROOKLYN L. REV. 325, 341–44 (1974). We cannot permit a result that would provide an incentive for law enforcement officers to disobey the law, for, as we have observed, "[w]e must be ever mindful that the prime obligation of government is to observe those rights embodied in our Bill of Rights which is 'a most important part' of our State Constitution." *State v. Tapply*, 124 N.H. 318, 325, 470 A.2d 900, 904 (1983) (citation omitted). When society crafts a rule for the conduct of its own affairs, such as *Miranda*, and seeks to gain an advantage from the violation of its own rule, the rule becomes murky and diluted and society itself is diminished in some manner. The precedential effect of the exception to the rule is the first step to the rule's being swallowed by its exceptions.

 In the context now before us we reject the United States Supreme Court's distinction between a "mere" violation of the *Miranda* safeguards and an infringement of the constitutional rights they protect. Deterrence of unlawful police behavior towards our citizens ought not to turn on such niceties. Our State constitutional provision forbidding the government from compelling an accused to furnish evidence against himself "guarantee[s] a defendant pro-

cedural protections, such as warnings and the requirement of a waiver, which safeguard the underlying State . . . right[ ] of freedom from self-incrimination." *State v. Nash*, 119 N.H. 728, 730–31, 407 A.2d 365, 367 (1979).

■■ Moreover, we have historically mandated, under article 15, more protection for a suspect's rights where *Miranda* is concerned than has the United States Supreme Court. For example, we require proof of a waiver to be established beyond a reasonable doubt, *see State v. Derby*, 131 N.H. 760, 761, 561 A.2d 504, 504 (1989); *State v. Gullick*, 118 N.H. 912, 915, 396 A.2d 554, 555 (1978), and we have established special rules for evaluating waivers by juveniles, *State v. Benoit*, 126 N.H. 6, 17–19, 490 A.2d 295, 302–04 (1985). If we are to remain faithful to our tradition of implementing the right against self-incrimination through rigorous enforcement of the *Miranda* safeguards, we must ensure that the police are not provided an incentive for disregarding these rights. To that end, we hold that statements obtained in violation of *Miranda* may not be relied upon to establish probable cause for issuance of a search warrant.

Our decision today determines that evidence obtained in violation of *Miranda*'s safeguards may not be used to supply probable cause for search warrants and does not suggest that such evidence is unavailable for use for all other purposes. *Compare Mincey v. Arizona*, 437 U.S. 399 (1978) (involuntary statements cannot be used in any way against defendant at trial) *with Harris v. New York*, 401 U.S. 222 (1971) (statement obtained in violation of *Miranda* may be used to impeach defendant).

■ The State argues that even if the information obtained from the defendant's statements is excised from the warrant affidavit, sufficient evidence supporting probable cause remains to uphold the warrant. The face of the warrant affidavit, however, reveals that this is not the case. As the State points out, the affidavit recites that the defendant related the "same story about his cocaine habit" to the nurse on duty at the jail, that he informed the nurse he would need drugs in order to prevent having convulsions, and that Trooper Quinn possessed information from the State Police that the defendant was involved with drug trafficking. None of this information establishes a reasonable probability, however, that the defendant at that time maintained drugs in his bedroom. *See State v. Kellenbeck*, 124 N.H. 760, 766, 474 A.2d 1388, 1392 (1984). Only the information supplied by the defendant to Trooper Quinn during his trip to the jail provided that link to the place to be searched. Because the warrant

application, stripped of the unlawfully obtained information, failed to establish probable cause, the drug evidence seized from the defendant's bedroom should have been suppressed.

In light of our holding that the evidence of the alleged offense was inadmissible, we need not address the other issues raised by the defendant.

*Reversed.*

HORTON, J., did not sit; THAYER, J., dissented; the others concurred.

THAYER, J., dissenting: While I agree with the majority's holding that the defendant's statements were obtained in violation of *Miranda*, I disagree that the remedy of exclusion must be extended, under our State Constitution, to non-testimonial evidence derived from that violation.

As the majority points out, the "derivative evidence," or "fruit of the poisonous tree," doctrine was developed in the context of the fourth amendment, and it is now black-letter law that evidence obtained through police conduct which violates a defendant's fourth amendment rights must be suppressed, as well as any evidence acquired as a result thereof. *Wong Sun v. United States*, 371 U.S. 471 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). *But see United States v. Leon*, 468 U.S. 897 (1984). It is clear that the purpose of the fourth amendment exclusionary rule is "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974).

Under both the fifth amendment to the United States Constitution and part I, article 15 of the New Hampshire Constitution, a defendant's involuntary statements must be suppressed, *Jackson v. Denno*, 378 U.S. 368 (1964); *State v. Howard*, 17 N.H. 171 (1845); and, more recently, both the United States Supreme Court and this court have found that involuntary statements cannot be used in any way against a defendant at his trial, *Mincey v. Arizona*, 437 U.S. 385, 402 (1978); *State v. Nash*, 119 N.H. 728, 733, 407 A.2d 365, 368 (1979). The purpose of the fifth amendment exclusionary rule is most often described as that of assuring trustworthy testimony. *See Oregon v. Elstad*, 470 U.S. 298, 308 (1985); *Michigan v. Tucker*, 417 U.S. 433, 448 (1974); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1518 (6th Cir. 1988).

The United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436 (1966), determined that an atmosphere of coercion was in-

herent in all custodial interrogations. *Id.* at 467. Therefore, the Court fashioned a prophylactic rule to guard against compelled statements which would counterbalance the inherent coercion of custodial interrogation. The rule requires law enforcement officers to advise suspects of certain rights, prior to custodial interrogation. The Supreme Court has mandated that noncompliance with *Miranda* requires suppression of the defendant's statements from the prosecution's case-in-chief, *Elstad,* 470 U.S. at 307, but that such statements can be used for other purposes "provided of course that the trustworthiness of the evidence satisfies legal standards," *Harris v. New York,* 401 U.S. 222, 224 (1971).

Although given the opportunity, the United States Supreme Court has chosen not to extend *Miranda*'s exclusionary remedy beyond the prosecution's case-in-chief. The Supreme Court has found that a violation of *Miranda* "[does] not bar[] the use of unwarned, voluntary statements to impeach a witness, *Harris v. New York,* [401 U.S. 222, 226 (1971)]; to identify a witness, *Michigan v. Tucker,* [417 U.S. at 450–52] to locate non-testimonial evidence, *New York v. Quarles,* [467 U.S. 649, 657–58 (1984)]; nor [does] suppression of a first, unwarned confession bar[] admission of a second confession of guilt, *Elstad,* [470 U.S. at 318]." *United States v. Morales,* 788 F.2d 883, 886 (2d Cir. 1986).

Similarly, the federal courts of appeals that have considered the issue before us today have also chosen not to extend the remedy available for a *Miranda* violation, and uniformly have held that non-testimonial evidence derived from a violation of *Miranda* is not subject to exclusion. *See, e.g., United States v. Gonzalez-Sandoval,* 894 F.2d 1043, 1048 (9th Cir. 1990) (deportation record obtained in violation of *Miranda* admissible at trial so long as there was no coercion or denial of due process); *United States v. Bengivenga,* 845 F.2d 593, 600–01 (5th Cir.) (bus ticket and baggage claim stubs derived from *Miranda* violation found admissible at trial), *cert. denied,* 488 U.S. 924 (1988); *Sangineto-Miranda,* 859 F.2d at 1516–18 (contraband admissible though its discovery was proximately derived from *Miranda* violation); *Morales,* 788 F.2d at 886 (statement obtained in violation of *Miranda* could be used in establishing probable cause to arrest). In refusing to extend the remedy for a violation of *Miranda,* the courts of appeals have stressed the different purposes of the exclusionary rules applicable to violations of the fourth and fifth amendments, *see Sangineto-Miranda,* 859 F.2d at 1518; *Morales,* 788 F.2d at 886, the Supreme Court decisions in *Elstad* and *Tucker,* *see Gonzalez-Sandoval,* 894 F.2d at 1048, and the fact that a violation

of *Miranda* is not the equivalent of a violation of the fifth amendment itself, *see Elstad*, 470 U.S. at 306 n.1; *Quarles*, 467 U.S. at 654; *Tucker*, 417 U.S. at 444. As one circuit court stated, "Where there is no evidence of coercion or a denial of due process in elicitation of the statements, the object of the fifth amendment exclusionary rule—assuring trustworthiness of evidence introduced at trial—is not served by barring admission of the derivatively obtained evidence or statements." *Gonzalez-Sandoval*, 894 F.2d at 1048.

Assuming that we adopted the prophylactic *Miranda* rule in *State v. Nash*, 119 N.H. at 730–31, 407 A.2d at 367, the majority's holding today conflicts with our own precedent. In general, we have previously applied exclusionary rules when the circumstances of the case included an actual violation of the New Hampshire Constitution itself. Under part I, article 15, we have held that involuntary statements are inadmissible and "cannot be used for any purpose." *Nash*, 119 N.H. at 733, 407 A.2d at 368 (citing *Mincey v. Arizona*, 434 U.S. 1343). Under part I, article 19, we have held that any statements made by a suspect during an illegal detention had to be suppressed at trial due to the violation of the suspect's constitutional rights relating to searches and seizures. *State v. Tapply*, 124 N.H. 318, 326, 470 A.2d 900, 905 (1983). Thus, disregarding federal precedent with regard to *Miranda*, a justification for today's expansion of *Miranda*'s exclusionary impact might exist if the circumstances of this case involved an actual violation of our State Constitution. However, I find none.

By its extension of *Miranda*'s exclusionary rule, the majority is in effect taking the position that evidence which is inadmissible in the prosecution's case-in-chief, even though its discovery did not violate our constitution, should not be admissible to establish probable cause. This result, however, contradicts our long-standing recognition that evidence may be used for the purpose of establishing probable cause even if it would not be admissible at trial. *See State v. Pellicci*, 133 N.H. 523, 537, 580 A.2d 710, 718–19 (1990) (inadmissible evidence obtained from police dog may be used to establish probable cause to arrest); *State v. Maya*, 126 N.H. 590, 598, 493 A.2d 1139, 1146 (1985) (in determining probable cause to issue a search warrant, magistrate did not err in considering evidence from a police tracking dog, although the evidence was not admissible at trial); *State v. St. Arnault*, 114 N.H. 216, 217–19, 317 A.2d 789, 790–91 (1974) (inadmissible hearsay evidence may be used to determine probable cause).

The majority's sole rationale for today's expansion of *Miranda*—a rationale not raised in the proceedings below, and neither briefed to this court nor argued before this court—is their belief that today's holding is necessary in order to deter misconduct by police officers. The majority argues that to allow police officers to use statements obtained in violation of *Miranda* to obtain a search warrant would encourage police officers who are "more concerned with the physical fruits of an unlawfully obtained confession than with the confession itself" to purposefully violate our State Constitution. I do not believe their analysis withstands scrutiny.

The potential evidentiary gain from a violation of *Miranda* is simply not worth the inherent evidentiary risk. The United States Supreme Court has held that a *Miranda* violation mandates exclusion of what is arguably the ideal result of police interrogation, the admission or confession of guilt. Indeed, in *State v. Phinney*, 117 N.H. 145, 370 A.2d 1153 (1977), we acknowledged that admission of a confession is tantamount to a guilty verdict. *Id.* at 147, 370 A.2d at 1154. For that reason, it is hard to imagine that the police would purposefully violate the requirements of *Miranda*, and thereby knowingly sacrifice the opportunity to use in the prosecution's case-in-chief any admission that the suspect might make, in favor of the mere possibility of obtaining a statement that later might lead to the discovery of non-testimonial evidence of dubious probative value. In my opinion, even assuming some deterrent effect exists, "[t]he arguable benefits from excluding such [evidence] by way of possibly deterring police conduct that might compel admissions are . . . far outweighed by the advantages of having relevant and probative [evidence], not obtained by actual coercion, available at criminal trials to aid in the pursuit of truth." *Tucker*, 417 U.S. at 461 (White, J., concurring).

"[W]here police simply fail to administer *Miranda* warnings, the admissibility of nontestimonial physical evidence derived from the uncounseled statements should turn on whether the statements were voluntary within the meaning of the fifth amendment." *Sangineto-Miranda*, 859 F.2d at 1518. Because I believe that suppression of the statements themselves from the prosecution's case-in-chief is sufficient under the facts of this case to advance the purpose of *Miranda*, and that the grounds stated by the majority for extending *Miranda*'s exclusionary rule are insufficient, I must respectfully dissent.